J-A21045-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF D.A.P., II, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.J.S., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 614 WDA 2017 |

Appeal from the Order entered March 8, 2017
In the Court of Common Pleas of Cambria County
Orphans' Court at No:  No. 2016-964-IVT

BEFORE:   BENDER, P.J.E., OLSON, and STABILE, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 16, 2017**

D.J.S. ("Mother") appeals from the March 8, 2017 decree in the Court of Common Pleas of Cambria County that involuntarily terminated her parental rights to her son, D.A.P., II ("Child"), born in February of 2006.[1] Upon careful review, we affirm.

We summarize the relevant facts and procedural history as follows.  In April of 2015, Cambria County Children and Youth Services ("CYS") received a report alleging that Child, who resided with Mother, had not been enrolled in school since February of 2013.  N.T., 1/17/17, at 9; Petitioner's Exhibit 5, at 2.  Following a hearing on June 6, 2015, the trial court adjudicated Child dependent and placed him in foster care.  N.T., 1/17/17, at 11.  In addition,

---

[1] The March 8, 2017 decree also involuntarily terminated the parental rights of Child's father, D.A.P.  D.A.P. did not file a notice of appeal.

the court appointed an educational decision maker and a CASA worker for this family. Petitioner's Exhibit 5, at 2.

Child is diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and autism. N.T., 1/17/17, at 38; N.T., 2/28/17, at 48, 63. At the time of his placement, Child was nine years old. The CYS caseworker, Carol Crouse, testified as follows regarding Child's condition at that time.

> [Child] was not able to drink from a straw. He could not hold a pencil. He could not navigate stairs. He didn't know what a sliding board was. He didn't know what a swing was for. He was afraid of everything, afraid to go outside, afraid to participate in any kind of group activities, was not willing to try new foods of any kind.

N.T., 1/17/17, at 16. Ms. Crouse testified that Child would only eat chicken nuggets. *Id.* Further, Ms. Crouse testified that Child "had a very unusual way of speaking." *Id.* at 17. She explained:

> If [Child] wanted to do something, he would ask a teacher, me do that? Or he would say, what that? It was as if he was very sheltered and he lacked a lot of social skills. He had informed me that he spent a lot of his time sitting on his bed while his mother was on the computer.

*Id.*

John Jubas, Ph.D., the court-appointed educational decision maker, explained that, in the fall of 2015, Child was chronologically in third grade, but he was assessed by the Richland School District as being two years behind academically. N.T., 2/28/17, at 41-42. The school district developed an Individual Education Program ("IEP") for Child, and assigned specialists to

him, including professional educators, an emotional support teacher, and speech and occupational therapists. *Id.* at 42.

The court established Child's placement goal as reunification. Mother was required to complete the following Family Service Plan ("FSP") objectives: cooperate with the Richland School District and Dr. Jubas; enroll in and complete parenting classes; cooperate with Independent Family Services ("IFS"), which supervised Mother's visits with Child; and participate in a psychiatric evaluation. N.T., 1/17/17, at 12.

On October 25, 2016, CYS filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). A hearing occurred on January 17 and February 28, 2017. CYS presented the testimony of its caseworker, Ms. Crouse, who testified that Child's progress "amazes" her and his teachers. N.T., 1/17/17, at 48-49. In addition, CYS presented the testimony of Dr. Jubas, who testified that Child's progress "has been strongly so encouraging." N.T., 2/28/17, at 47. He testified that, at the time of the subject proceedings, Child was in the fourth grade classroom and only one year behind academically. *Id.* at 46-47. Further, CYS presented the testimony of Jessica Quist, the IFS therapist, who supervised Mother's visits with Child and worked with Mother on her parenting skills from approximately August of 2015, through June of 2016. Finally, CYS presented the testimony of

Dennis Kashurba, a licensed psychologist, who performed a psychological evaluation of Mother in May of 2016. Mother testified on her own behalf.

By decree dated March 8, 2017, and entered on March 9, 2017, the orphans' court granted the involuntary termination petition. On March 23, 2017, Mother's court-appointed counsel, Suzann M. Lehmier, Esquire, requested the withdrawal of her appearance. On March 24, 2017, the court granted her request and appointed Gregory Neugebauer, Esquire, to represent Mother in any appeal proceedings. On April 13, 2017, Attorney Neugebauer filed a petition to file a notice of appeal *nunc pro tunc*, which the orphans' court granted on April 18, 2017. Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On May 1, 2017, the orphans' court filed an opinion pursuant to Rule 1925(b), wherein the court relied on its findings set forth in the subject decree.

On appeal, Mother raises the following issue for our review:

1. Whether the [c]ourt either abused its discretion or committed an error of law when it granted the [p]etition for [i]nvoluntary [t]ermination of [p]arental [r]ights, thereby terminating the parental rights of [Mother] to [Child][?]

Mother's Brief at 2.

We consider Mother's issue according to the following standard.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

- 4 -

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we

- 5 -

conclude that the certified record supports the decree pursuant to Section 2511(a)(2) and (b), which provides as follows.[2]

>  **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>  . . .
>
>>  (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>  . . .
>
>  **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

>  This Court has stated as follows.
>
>  In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2)

---

[2] Based on this disposition, we need not consider Mother's issues with respect to Section 2511(a)(1), (5), and (8).

such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). Further, we have stated, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

With respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

On appeal, Mother argues that the orphans' court abused its discretion pursuant to Section 2511(a)(2) because Child's educational needs can be

- 7 -

met without terminating her parental rights. In essence, she asserts the only concerns keeping Child in placement is his schooling. Mother asserts the schooling concerns have been remedied with the assistance of Dr. Jubas, the court-appointed educational decision maker, with whom she promises to cooperate. The competent record evidence belies Mother's argument.

Contrary to Mother's assertions, the certified record demonstrates that Mother's repeated and continued incapacity due to her mental health has caused Child to be without essential parental care, control, or subsistence necessary for his physical and mental well-being. Further, the record demonstrates that the causes of Mother's incapacity cannot or will not be remedied.

Dennis Kashurba, who performed a psychological evaluation of Mother, testified that Mother is diagnosed with bipolar disorder; anxiety disorder not otherwise specified; depressive disorder not otherwise specified; parent/child relational problem and relational problem not otherwise specified; and paranoid personality disorder with schizotypal features. N.T., 1/17/17, at 76.

The orphans' court found significant the prognosis of Jessica Quist, the IFS therapist, as follows.

> The prognosis of the . . . family continues to remain very questionable due to [Mother's] mental health symptoms. [Mother's] ongoing lack of insight into her mental health [symptoms] continues to be a major barrier for the family. . . .[Mother's] continued inability to acknowledge/recognize the need for change of her parenting for [Child's] needs and her

> continued lack of developing positive relationships with educational providers [sic]. . . . [Mother] continues to make comments during the visits with [Child] that 'I was doing a better job with teaching him while he was at home.'[3] . . . [Mother's] mental health symptomology is also a concern with regards to having any insight into [Child's] needs. [Mother] has stated irrational ideas regarding [Child] and the others involved in his care. [Mother's] preoccupation with these ideas makes it difficult to redirect her into focusing on developing her parenting skills.

Decree, 3/8/17, at ¶ 10 (*quoting* Petitioner's Exhibit 13, at 3 (unpaginated)).

Ms. Quist testified that, in addition to supervising Mother's visits with Child, she tried to help Mother improve her communication skills with Child and with the Richland School District. N.T., 2/28/17, at 6. Ms. Quist testified that Mother had "delusional conspiracy" theories regarding Child's elementary school and his teachers. *Id.* at 10. Further, she testified that Mother "had a negative attitude with regard to [Child's] education." *Id.* at 9. She testified that Mother "criticized a lot of things that [Child] would like to share with her about how the week went with school. That basically she didn't appear to think that the way the classes were at Richland School District were appropriate to meet [Child's] needs." *Id.* Moreover, Ms. Quist testified that Mother did not recognize the progress that Child was making. She testified on direct examination as follows.

---

[3] Ms. Crouse, the CYS caseworker, acknowledged on cross-examination by the Guardian *Ad Litem* that she was unaware of any state-mandated homeschooling lesson plan that Mother followed during the years that Child was not in school. N.T., 1/17/17, 50.

Q. You indicated that [Mother] would make comments about [Child's] comprehension and things like that to him and that he would appear to be upset. What would his demeanor be like?

A. He would appear to be almost defeated. [Mother] would say his comprehension is not what it should be. [She would say,] ["]I was teaching him much better when he was at home.["] . . . [T]he longer I worked with [Child], the better you saw his socialization. He needed a little more time to express what he was trying to say. He needed to think about it. But you could tell he was improving and talking a lot more. But [Mother] did not appear to see that as any kind of progress with [Child]. . . .

*Id.* at 11-12.

In addition, Ms. Quist testified that Mother had "irrational ideas" involving Child's foster family. Specifically, she testified that Mother thought the foster family was "trying to ruin [Child], and she would say that directly in front of [Child], and criticize the foster family repeatedly for not taking care of him." *Id.* at 13. She testified that Child "was actually very hurt by [Mother's] statements about the foster family because he had grown to care for them. . . ." *Id.* Further, the foster family was meeting Child's needs. *Id.* at 36-37.

Importantly, with respect to Mother's parenting skills, Ms. Quist testified that her skills had declined during the approximately nine months she worked with her. N.T., 2/28/17, at 14-15.

Q. Was [Mother] open to suggestions – or would you give her suggestions on how to improve her parenting?

A. I would politely make suggestions, but [Mother] would politely decline any suggestions. We did suggest some activities and things like that to do. And she would never be mean, but she would politely decline and say she had plans for things to do with

[Child]. But as far as school, the situation with his education, [Mother] did not want to take any [suggestions regarding] getting along with the school district, even improve the relationship so she could even talk to the educators more, she didn't wish to do that.

*Id.* at 14.

Dr. Jubas testified he had meetings with Mother to share information about Child's IEP and the progress he was making. N.T., 2/28/17, at 43. He described Mother during those meeting as being "very agitated . . . as to what we were trying to do. . . ." *Id.* at 44. He explained that Mother "was just not a real supporter of the Richland School[, but she provided] no[] detail as to what was wrong with the school."[4] *Id.* at 58.

Moreover, Mr. Kashurba testified with respect to his overall conclusions following the psychological evaluation he performed on Mother in May 2016, as follows.

[Mother] had sufficient intellectual ability to learn appropriate parenting strategies. However, it does appear that her mental health issues are likely to adversely affect her ability to implement these independently in the foreseeable future.

. . . [H]er current psychotropic medication regimen would appear to have addressed her primary affective spectrum symptoms of anxiety and depression. . . .

---

[4] Ms. Crouse testified that Dr. Jubas' meetings with Mother occurred at the CYS office and not on school property because Child "had relayed that his mother was not happy with the school district and that she had made threats to go blow the school up, so the district was very wary of having her come to their school." N.T., 1/17/17, at 15.

> [  ] [N]evertheless, her thought processes appear to be significantly impaired as evidenced by her tendency to permit the events from long ago to dominate the here and now of her circumstances and those of her son. At this point, it does not appear likely she will be able to ameliorate her mental health issues . . . before her son has been in placement for 15 consecutive months.

N.T., 1/17/17, at 77-78. Mr. Kashurba explained that Mother had been receiving psychiatric treatment for fifteen years. *Id.* at 80. Further, when he evaluated Mother, Child had been in placement for approximately eleven and one-half months. *Id.* Therefore, Mr. Kashurba testified, "I don't see how within a reasonable period of time one could be assured that [Mother's mental] issues could be resolved." *Id.* at 79.

Finally, Ms. Crouse testified on direct examination that Mother's telephone conversations with Child were recently reduced to ten minutes per week and to be supervised by the foster parent for the following reason.

> [Mother] was on the phone with [Child] and the foster mother had exited the home. She was only in the front yard. And [Mother] had told [Child], ["]the foster mother left you alone, she's not allowed to do that, you should go hide up in the attic and call 911.["] And that greatly frightened [Child].

N.T., 1/17/17, at 19-20. Ms. Crouse testified that Mother's parental rights should be terminated "due to the longevity and the severity of her mental health." *Id.* at 33. She continued as follows.

> It's difficult as adults whenever we talk to [Mother] sometimes. It's extremely difficult to expect a ten-year-old little boy to be able to reach his mother and to respond accordingly to her because he is afraid that he's going to make her angry with his responses, and he walked on eggshells whenever he's around her.

- 12 -

*Id.* Based on the foregoing, we conclude that the testimonial evidence overwhelmingly supports the termination of Mother's parental rights pursuant to Section 2511(a)(2).

With respect to Section 2511(b), Mother argues that the orphans' court abused its discretion because there is no record evidence that Mother's "interactions were either unhealthy or harmful to the Child." Mother's Brief at 14. In addition, Mother asserts, "Child stands to lose . . . an extremely important bond." *Id.* The competent record evidence again belies Mother's argument.

This Court has explained as follows.

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

- 13 -

J-A21045-17

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

The orphans' court found as follows.

12. . . . Mother expressed that she does have a bond with [Child], and, no doubt, loves her son. However, her actions, or failure to act, speak louder than her words. Considering the testimony of the caseworker and court-appointed educational decision maker, this child has made amazing progress since being placed with a foster family and is now in elementary school full-time. As testified, he is like a "sponge," absorbing all that his mother kept from him for over two years. . . . The [c]ourt placed little weight on [Mother's] testimony. As the caseworker stated . . . "This child deserves to have a family who make sure that Child continues to grow and that he reaches his full potential."

13. In terminating the parental rights of [Mother], this [c]ourt has found that this will best meet the development[al], physical and emotional needs and welfare of the child.

Decree, 3/8/17, at ¶ 12 (*citing* Petitioner's Exhibit 11). The testimonial evidence supports the court's findings.

Dr. Jubas testified, in part:

Q. . . . Were some of [Child's] issues [at the time of his placement] a result of [his] autism or do you believe that they are more [as] a result of an isolated, unstimulated [home] environment?

A. . . . [A]ny child with any disability, if properly schooled in the home setting in the early years[,] certainly has time for growth and development in those particular skills [that Child was lacking at placement]. . . . At this point there was every indication and observation that this child wasn't given a very strong educational early setting in the home.

Q. And that could . . . be a reason for [Child's developmental] delays?

- 14 -

A. It certainly gives a strong approach to it, yes.

N.T., 2/28/17, at 70-71.[5]

Dr. Jubas testified that Child's progress "is extremely high," which he credits to Child's teacher and to his comfort level with the Richland School District. N.T., 2/28/17, at 60. In addition, Ms. Crouse testified that Child "is a very sweet young man. He adores going to school. He would become very upset whenever he learned it was Friday and that he would be off Saturday and Sunday." N.T., 1/17/17, at 22. Ms. Crouse explained that Child did not initially "understand that Saturday and Sunday were a weekend and that he would be staying at home and not attending school." *Id.*

Ms. Quist, who supervised visits between Mother and Child, testified, "[o]ftentimes . . . [Mother] didn't pay attention to [Child] during the visits." N.T., 2/28/17, at 18. She testified that Mother had poor communication with Child. *Id.* at 19. Ms. Quist explained on direct examination,

> [Child] would often try to speak and he was often interrupted, not allowed to finish what he was saying. . . . [Mother] told [Child] she didn't like to hear certain things that he had to say, especially when it came to his interest of dinosaurs and things like that. She told him it bothered her and she didn't want to hear it. It wasn't promoted that [Child] could fully express himself to her.

---

[5] Similarly, Ms. Crouse testified on direct examination that Child "had told the foster parents that he was not allowed to draw, and he is a very talented little artist. He loves to draw. I think that he led a very sheltered life [while in Mother's custody]." N.T., 1/17/17, at 18.

*Id.* As a result, she testified that, over time, Child "didn't appear to make as much effort to try to talk to his mother." *Id.*

Ms. Quist testified with respect to the nature of the bond between Mother and Child as follows.

> At times they appeared to get along very well and then it was other times it was amiss with, depending on [Mother's] mood, [Child] would often just get his coat and get his stuff and run out the door as soon as the visit was over. [Mother] would have to ask for a hug goodbye or a kiss goodbye. He did not usually offer that freely. I didn't see any bond actually getting better with him over time.

*Id.* at 20. In short, she testified on direct examination,

> Q. Do you see a strong parent/child relationship [between Mother and Child]?
>
> A. No.

*Id.* Ms. Quist testified that it is in Child's best interest for Mother's parental rights to be terminated. *Id.* at 20-21.

Similarly, Ms. Crouse testified that she personally supervised some visits between Mother and Child, and that she did not observe a bond between them. N.T., 1/17/17, at 19, 27. She described the visits as follows.

> The visits were very cold and clinical. [Child] would show affection at the end of the visit if he was asked. I did not hear [Child] refer to his mother by mom. There were times that he would refer to his mom as the foster parent. . . .
>
> When time was winding down, [Child] would begin gathering up anything that he brought with him. He put his coat on, put his

hat on, and he would make the announcement[,] [\"]I'm ready to go home.[\"] And by home, he meant the foster home.

*Id.* Further, Ms. Crouse testified, Child "has made statements that, if he had to go back home to his mother, he would walk out the door[,] and he would walk back to the foster home." *Id.* at 25.

Ms. Crouse testified that Child is doing "extremely well with the foster parents. He has flourished. He doesn't leave the foster home unless he gives the foster mother a kiss on each cheek and one on her forehead. . . . He is affectionate with the foster father." N.T., 1/17/17, at 23. As such, she testified that Child is bonded with his foster family. *Id.* at 25.

Importantly, Ms. Crouse testified on direct examination with respect to whether the involuntary termination of Mother's parental rights will serve the needs and welfare of Child, as follows.

> Q. Do you believe that . . . if there is any . . . minuscule bond [that] does exist [between Mother and Child], that severing that bond is in the best interests of [Child]?
>
> A. Yes, I do.
>
> Q. Do you believe that severing that bond would promote [Child's] developmental, physical and emotional needs?
>
> A. Yes, I do.
>
> Q. Why do you feel that way?
>
> A. Because of the condition that [Child] was in when he entered care and the amount of progress that he's made since he's been in care[.] [I]f [Child] were to be returned home[,] I would fear that he would regress back to the child that he was upon his placement.

N.T., 1/17/17, at 31.

Based on the foregoing testimony, and our review of the entire record before this Court, we conclude that the evidence overwhelmingly supports the termination of Mother's parental rights pursuant to Section 2511(b). Mother's arguments on appeal are without merit. Accordingly, we affirm the decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/16/2017